IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
IN OPEN COURT

APR – 9 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　)　　No. 1:18cr11
　　　　　　　　　　　　　　　　　)
ERICK J. ALEXANDER,　　　　)
　　　　Defendant.　　　　　　)

**Statement of Facts**

The United States and the defendant, Erick J. Alexander, stipulate that the allegations in the Indictment and the following facts are true and correct. The United States and Alexander further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Indictment and the following facts beyond a reasonable doubt.

I.　　**Introduction**

1.　　As set forth in greater detail below, from in or about March 2014 through in or about July 2015, in the Eastern District of Virginia and elsewhere, defendant Erick J. Alexander, having devised and intended to devise a scheme and artifice to defraud K.G., and to obtain from K.G. money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly transmitted and caused to be transmitted wire communications in interstate commerce for the purpose of executing the scheme and artifice. More specifically, during the time period of the scheme, Alexander fraudulently received payments totaling $165,265 from K.G., $114,515 of which Alexander then used for his own benefit.

II.　　**Factual Background**

2.　　In or around August 2013, K.G., a Virginia-based entrepreneur, formed Company #1, a limited liability corporation organized under the laws of the Commonwealth of Virginia for

the purposes of opening a dry cleaning store in Woodbridge, Virginia. Company #1 was headquartered in Stafford, Virginia, within the Eastern District of Virginia.

3.      In or about September 2013, Company #1 entered into a franchise agreement to open a dry cleaning store in Woodbridge, Virginia.

4.      Alexander is a United States citizen and resident of the State of New York. He is the founder and/or chief executive of several companies, including MoneyPhysicians, Inc. ("MPI"), Enterprise Transformers, Inc. ("ETI"), Global V. Square ("GVS"), and Shelter Realty ("SR").

5.      Alexander marketed himself as an entrepreneur with over 25 years of experience in financial services, business consulting, and investment banking, specializing in assisting small- and medium-sized companies obtain funding for their businesses.

6.      On or about March 15, 2011, Alexander opened a business checking account with E*Trade in the name of MPI. Prior to March 2014, the account had a negative balance of $4.29.

7.      On or about February 20, 2014, Alexander opened a Capital One business checking account in the name of Company #1. Alexander is the sole signatory on the account. At no point was K.G. listed as a signatory authority on the account.

8.      Alexander also maintained a Capital One accounts in the names of MPI, GVS, and SR:

  a.  Prior to receiving a $25,000 transfer from the Capital One account for Company #1 on or about March 5, 2014, Alexander's MPI account had a balance of $1,073.98.

  b.  Prior to receiving a $1,000 transfer from the Capital One account for Company #1 on or about August 29, 2014, Alexander's GVS account was overdrawn by $244.36.

2

    c.  Prior to receiving a $1,000 transfer from the Capital One account for Company #1 on or about August 29, 2014, Alexander's SR account was overdrawn by $418.57.

9.    K.G. maintained credit cards with Comerica Bank and NASA Federal Credit Union. K.G. also had a personal checking account with Bank of America.

## III.  Criminal Conduct

10.    On or about February 10, 2014, K.G. and Alexander entered into a memorandum of understanding whereby Alexander, through his company MPI, would help K.G. obtain the capital K.G. needed to open the dry cleaning store.

11.    Alexander told K.G. that he could help K.G. obtain the funding because Alexander expected to secure a $30 million business deal, and he would use part of the money to fund K.G.'s businesses and other companies that were part of MPI's portfolio. In the event the $30 million deal fell through, Alexander promised that he would help K.G. obtain loans to finance K.G.'s business.

12.    Alexander represented to K.G. that he would be on the cover of Forbes Magazine because of this $30 million deal. Alexander sent a text message to K.G. on or about February 12, 2014, claiming that he was at a meeting with Forbes Magazine. Alexander was never, in fact on the cover of Forbes Magazine, nor was he ever interviewed to appear on the cover of Forbes Magazine.

13.    As part of the scheme, Alexander instructed K.G. to deposit funds into the Capital One bank account for Company #1 that was under Alexander's control, which Alexander claimed would be necessary to assist K.G. in obtaining funds. Alexander represented to K.G. that K.G. would have full access to the account. However, Alexander never provided K.G. with signatory authority or access to the Capital One bank account for Company #1.

14.     Alexander further represented to K.G. that he would not spend the funds that K.G. deposited into the account but rather would leverage the funds to obtain a loan on behalf of Company #1.

15.     On or about March 3, 2014, in Stafford, Virginia, K.G. initiated a wire transaction in the amount of $130,000 from his Bank of America personal checking account to the Capital One account for Company #1 controlled by Alexander. At the time of the transfer, the Capital One account for Company #1 had a balance of $234.63.

16.     Because K.G. did not have access to the account, K.G. requested Alexander make four payments necessary to keep K.G.'s business afloat. Alexander made those payments, totaling $50,750, using the money from the original $130,000 wire from K.G.

17.     By on or about August 4, 2014, Alexander had spent, withdrew, or transferred to other accounts in Alexander's control all of the remaining money that K.G. wired into the account. The transactions included transfers to other business accounts in Alexander's name, ATM withdrawals, point-of-sale transactions, and electronic payments. These expenditures were not made for K.G.'s benefit. On or about August 11, 2014, the Capital One account for Company #1 was overdrawn by $128.65.

18.     After the account was overdrawn, Alexander approached K.G. requesting an additional $13,000. Alexander told K.G. that he needed the money because he was about to close a funding deal for Company #1 and needed to pay fees related to the deal. On or about August 27, 2014, K.G. deposited the additional $13,000 into the account. On or about August 29, 2014, Alexander sent K.G. a text message requesting that K.G.'s bank release the additional funds. By on or about September 22, 2014, only $114.86 remained in the account. K.G. never obtained funding from any deal associated with Alexander.

19.    At various times throughout 2014, K.G. wired an additional $6,450 to MPI accounts controlled by Alexander.

20.    On or about October 31, 2014, K.G. sent Alexander a text message asking Alexander to transfer $90,000 that K.G. believed was still in the Capital One account for Company #1. At the time K.G. sent this text message, the account had a negative balance of $110.68. Alexander never informed K.G. that the account had a negative balance, nor did he tell K.G. that the money was gone.

21.    In or around March 2015, Alexander and K.G. had a meeting in which Alexander told K.G. that K.G.'s money had been moved from the original Capital One account for Company #1 to another account that was part of a Capital One pilot venture program. At no point during this meeting did Alexander tell K.G. that K.G.'s money was gone.

22.    Alexander never reimbursed K.G. for the credit card charges, nor did Alexander repay any of the remaining money K.G. wired to him. In total, Alexander obtained $114,515 in fraudulent proceeds from K.G.

IV.    Conclusion

23.    Alexander's actions in furtherance of these offenses, including but not limited to the acts described above, were done willfully, knowingly, with the specific intent to violate the law, and not because of accident, mistake, or innocent reason.

24.    The foregoing statement of facts is a summary of the principal facts that constitute the legal elements of wire fraud. This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that would be used to determine Alexander's sentence under the Sentencing Guidelines. Alexander acknowledges that the

foregoing statement of facts does not describe all of Alexander's conduct relating to the offense

charged in this case.

Respectfully submitted,

Tracy Doherty-McCormick
Acting United States Attorney

By:  Jamar K. Walker
     Assistant United States Attorney
     Matthew D. Evans
     Special Assistant United States Attorney

Defendant's Stipulation and Signature: After consulting with my attorneys and reviewing the above statement of facts, I stipulate that the above statement of facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proven the same beyond a reasonable doubt.

_____
Erick J. Alexander
Defendant

Defense Counsel's Signature: I am Erick J. Alexander's attorney. I have carefully reviewed the above statement of facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Whitney E.C. Minter
Counsel for the Defendant